# United States Court of Appeals
## For the First Circuit

No. 09-2048

WOJCIECH BIELUNAS,

Plaintiff, Appellee,

v.

F/V MISTY DAWN, INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Boudin, Gajarsa[*] and Thompson,
<u>Circuit Judges</u>.

<u>Joseph A. Regan</u>, with whom <u>John David Blaisdell</u> and <u>Regan & Kelley LLP</u> were on brief, for appellant.
<u>Joseph S. Stacey</u>, with whom <u>James P. Jacobsen</u> and <u>Beard Stacey & Jacobsen LLP</u> were on brief, for appellee.

October 8, 2010

[*]Of the Federal Circuit, sitting by designation.

**THOMPSON**, **Circuit Judge**. This case – according to Wojciech Bielunas – is about life-altering pain. Working as a commercial fisherman aboard the F/V SEA WATCHER I, Bielunas had his right foot crushed in a ghastly accident. An orthopedic surgeon said it looked like someone had taken a sledgehammer to Bielunas's foot. His livelihood lost, Bielunas later sued the vessel's owner, F/V Misty Dawn, Inc., charging Jones Act negligence,[1] ship unseaworthiness, and a right to maintenance and cure.[2] A jury returned a verdict in Bielunas's favor, and the district judge entered judgment against Misty Dawn for $2,307,690. In this arena, Misty Dawn criticizes the district judge for admitting certain evidence and denying a motion for new trial or remittitur. Detecting no hint of reversible error, we affirm the judgment below.

## Background

We present the facts in the light most flattering to the jury's verdict. See, e.g., Whitfield v. Melendez-Rivera, 431 F.3d 1, 3 (1st Cir. 2005). Bielunas emigrated from Poland to the United States with his family in 1995, eventually settling in rural

---

[1] 46 U.S.C. § 30104.

[2] A venerable remedy created to protect seamen from the dangers of living and laboring at sea, maintenance and cure "refers to the provision of, or payment for, food and lodging ('maintenance') as well as any necessary health-care expenses ('cure') incurred during the period of recovery from an injury or malady." LeBlanc v. B.G.T. Corp., 992 F.2d 394, 396-97 (1st Cir. 1993).

Pennsylvania. He had worked on fishing boats before leaving Poland, and he became a commercial fisherman here. From 2005 through 2006, Bielunas worked for Misty Dawn, a Massachusetts corporation, on its vessel, the SEA WATCHER.

Safety was hardly the watchword for Misty Dawn's conduct. The company made no real effort to ensure that its employees complied with accepted safety standards. Misty Dawn had some safety guidelines, but they were not posted anywhere on the SEA WATCHER. Instead, the company relied on word-of-mouth, with ownership passing safety concerns to the captain who then passed them on to the crew. But there is some dispute whether ownership ever did this.

To make the venture as profitable as possible, Misty Dawn stored clam cages on the walkways. With the walkways blocked, crew members looking to traverse the ship had to sidle along a thin, unguarded ledge overlooking a nine-foot drop into the cargo hold or amble over a conveyor belt. But the conveyor belt was not a realistic option because the belt was quite slippery and the system lacked adequate handrails, so the crew (including the captain) opted to shimmy along the hatch ledge. Apparently no one told them not to do this.

That brings us to the accident. Asked to help close the hatch that covered the cargo hold, Bielunas had to indicate to another crew member when the cover was in the proper position – a wire

cable attached to a hydraulically-powered machine would haul the hatch forward along the ledge. Ideally, one would perform this job by standing on the designated walkways. But because they were blocked, Bielunas rode atop the closing hatch cover – that is how he and others had done it before, and no one had ever told him to do it differently. Unfortunately, he lost his balance, stepped onto the ledge to keep from falling into the cargo hold, and got his right foot caught between the cover and a protruding piece of metal. "Stop, stop," Bielunas yelled, hoping to get the attention of the seaman operating the hydraulically-powered machine. Bielunas could feel steel pressing into him, crushing his foot. Flesh and muscle were stripped off the bone, leaving a gaping hole. Blood was everywhere.

The Coast Guard airlifted Bielunas to a hospital on Cape Cod, where a doctor performed a series of emergency surgeries. The doctor noticed that about half of the bone material was dead. He removed the dead matter and a significant amount of dead muscle and tissue, too, but he could not close the wound. Eventually, after nearly two months, doctors sealed the opening, but Bielunas's foot is still disfigured, and the damage is severe, permanent, and degenerative. As if this were not enough, Bielunas walks with a pronounced limp, and his altered gait triggered back and knee problems.

Bielunas will never be able to return to any form of hard

work.  His poor English skills make it highly unlikely that he will ever be able to do office or clerical work.  Because this work is the only kind of employment that a person with his new physical disability would be capable of performing, Bielunas will likely never be able to work again – he can even cross-off pizza delivery and security guard from any list of potential jobs because his mangled foot affects his driving and ability to patrol a site, too.

Bielunas's total medical and economic damages approximated $762,000.  In his opening statement, Bielunas's lawyer pushed for a $2,500,000 damages award, which he upped to $3,328,767 in his closing.  The jury returned a $2,775,000 verdict against Misty Dawn but also found Bielunas 15% comparatively negligent.  Factoring in the 15% figure and an agreed-upon set-off between the parties, the district judge entered a $2,307,690 judgment in Bielunas's favor.  Misty Dawn moved for a new trial or a remittitur, which the district denied in an unexplained order.

With this background in place, we turn to the issues presented on appeal, highlighting further facts when needed to put Misty Dawn's claims into proper perspective.

## Evidentiary Issues

Misty Dawn contends that the district judge erred in admitting plaintiff's exhibit 32 and Lawson Bronson's expert testimony.  Neither claim has traction.

### Plaintiff's exhibit 32

The protested exhibit is a staged photo (apparently taken by a defense expert) of a deckhand holding a wire and sidling along a nine-inch hatch ledge, as the SEA WATCHER's crew frequently would. Misty Dawn argues here, as it did below, that the exhibit is irrelevant because Bielunas was injured while standing on the moving hatch cover – not while traveling along the hatch ledge holding a wire. This argument is easily disposed of.

A relevancy-based argument is usually a tough sell. The definition of relevance is quite expansive: relevant evidence is "evidence having <u>any</u> tendency to make the existence of any fact that is of consequence" more or less probable. <u>See</u> Fed. R. Evid. 401 (emphasis added). To be relevant, the evidence need not definitively resolve a key issue in the case, <u>see</u>, <u>e.g.</u>, <u>United States</u> v. <u>Rivera Calderón</u>, 578 F.3d 78, 96-97 (1st Cir. 2009), <u>cert. denied</u>, 130 S. Ct. 1107 (2010) – it need only move the inquiry forward to some degree, <u>see</u> 2 Jack B. Weinstein & Margaret A. Berger, <u>Weinstein's Federal Evidence</u> § 401.04[2][b] (Joseph M. McLaughlin ed., 2d ed. 2010). Because this is a quintessential judgment call, <u>see</u> <u>Morales Feliciano</u> v. <u>Rullán</u>, 378 F.3d 42, 57 (1st Cir. 2004), we give trial judges considerable leeway in deciding whether the contested evidence satisfies this not-too-difficult-to-meet standard, reversing only on a showing of abuse of discretion, <u>see</u>, <u>e.g.</u>, <u>United States</u> v. <u>Sepulveda</u>, 15 F.3d 1161, 1194 (1st Cir. 1993).

-6-

Relevancy is not assessed in a vacuum – it is gauged "in light of the underlying substantive law," see Roy v. The Austin Co., 194 F.3d 840, 843 (7th Cir. 1999), here, Jones Act negligence and ship unseaworthiness. A Jones Act shipowner must see "to the safety of the crew." Koehler v. Presque-Isle Transp. Co., 141 F.2d 490, 491 (2d Cir. 1944) (Frank, J.). A crew member's burden of proving causation is "featherweight," meaning liability exists if the shipowner's "negligence contributed even in the slightest" to the injury. Ferrara v. A. & V. Fishing, Inc., 99 F.3d 449, 453 (1st Cir. 1996) (quotation marks omitted). Also, a shipowner must keep the ship – its decks, passageways, equipment, etc. – in a seaworthy condition and must use safe work methods, too. See id. And a shipowner is responsible for unseaworthiness-induced injuries even if not negligent. See id.

If a picture speaks a thousand words, this one spoke plenty, giving context so the jury could better understand the parties' actions. Again, the photo showed a seaman inching his way along a tiny hatch ledge with no guardrails while lugging a wire – an unacceptable practice, Bielunas's expert said, which Misty Dawn turned a blind eye to and which highlighted Misty Dawn's cavalier attitude toward safety. The photo also showed a ship with blocked walkways, which further bolstered Bielunas's theory that Misty Dawn failed to provide a safe deck for work on the high seas. Misty Dawn talked a good game about how crew safety was a top concern,

-7-

but the photo suggested otherwise.  Seen in this light, then, the photo tended to make Misty Dawn's negligence and the ship's unseaworthiness more probable, see generally DeGioia v. United States Lines Co., 304 F.2d 421, 423 (2d Cir. 1962) (holding that a cluttered deck constitutes Jones Act negligence and vessel unseaworthiness); Bonnewell v. United States, 170 F.2d 411, 412-13 (4th Cir. 1948) (same) – which is all the liberal relevancy standard requires, see, e.g., Iacobucci v. Boulter, 193 F.3d 14, 20 (1st Cir. 1999).  Consequently, the district judge did not abuse his broad discretion in admitting plaintiff's exhibit 32.

**Bronson's testimony**

Also sailing wide of the mark is Misty Dawn's claim that the district judge stumbled in admitting Bronson's testimony about the means of traversing the deck, the danger of obstructing the walkways, and other safety problems on the SEA WATCHER.  Misty Dawn calls this testimony irrelevant and says its admission affected the verdict (Misty Dawn does not contest Bronson's expert credentials) – which means we apply the abuse-of-discretion standard.  See, e.g., Pagés-Ramírez v. Ramírez-González, 605 F.3d 109, 115-16 (1st Cir. 2010).  Again, that standard is hard to satisfy, and Misty Dawn cannot satisfy it here.

Bronson's testimony – discussing the meaning and significance of the staged photo, the dangers posed by the open hatch covers and the missing conveyor belt handrails, etc. – went to matters of

consequence: did Misty Dawn provide Bielunas with a safe work place, and was the SEA WATCHER seaworthy? Misty Dawn protests that Bielunas was not hurt while sidling along the hatch ledge (a Misty Dawn-accepted practice that Bronson condemned), that only one cover was open when tragedy struck, and that the missing handrails played no part in the mishap (ignoring that Misty Dawn had faulted Bielunas for not standing on the conveyor belt during the hatch-closing episode, a ridiculously unsafe suggestion, Bronson said, given the lack of handrails). But this evidence gave the jury a proper frame of reference for assessing the parties' competing claims, so it is relevant. See Faigin v. Kelly, 184 F.3d 67, 81 (1st Cir. 1999). Misty Dawn could and did fight tooth and nail to undermine the evidence's meaning. But once relevancy is found, complaints of the sort Misty Dawn pursues go to the weight, not the admissibility, of Bronson's testimony. See, e.g., United States v. Schultz, 333 F.3d 393, 416 (2d Cir. 2003); United States v. Diaz, 878 F.2d 608, 615 (2d Cir. 1989). The upshot of all this is that we do not see anything close to an abuse of discretion here.[3]

---

[3] Because there was no error, we need not consider Misty Dawn's grumble that the admission of Bronson's testimony affected the trial's outcome, see Fed. R. Evid. 103 – a complaint that turns in part on Misty Dawn's claim that Bielunas's counsel weaved Bronson's "irrelevant" testimony into his closing argument. Misty Dawn's brief focuses on the evidentiary issue (which falters, given how easily Bronson's testimony clears the low relevancy hurdle) and makes no attempt to construct a reasoned argument that Bielunas's counsel's closing constituted misconduct, so our work on this is done. See, e.g., McCullen v. Coakley, 571 F.3d 167, 182 & n.3 (1st Cir. 2009) (deeming waived arguments hinted at but not developed

## The New Trial/Remittitur Issues

In its post-trial motion, Misty Dawn blasted Bielunas's counsel for suggesting a damage award in his opening statement ($2,500,000) and closing argument ($3,328,767), saying counsel's comments unfairly influenced the jury and entitled it to a new trial. Misty Dawn also contended that the jury's ultimate award ($2,775,000, constituting roughly $2,000,000 in non-economic damages, which is the crux of the matter) was simply too large to stand. The district judge denied the motion without comment, so we have two choices: remand for clarification or address the issue head-on "if a reasonable basis supporting the order is made manifest on the record." United States v. Podolsky, 158 F.3d 12, 16 (1st Cir. 1998); see also generally Presley v. United States Postal Serv., 317 F.3d 167, 173 (2d Cir. 2003) (noting that "[w]hile a written explanation of a district court's basis for denying [a new-trial motion] is certainly preferable as an aid to appellate review, a separate written opinion is not necessarily required when a district court" rebuffs the motion). We choose option two in this instance.

### Suggesting specific damage amount

Misty Dawn did not object to the specific-damage-award comments in Bielunas's counsel's opening statement and closing

---

and addressed to a particular theory), cert. denied, 130 S. Ct. 1881 (2010).

summation. Rather, it first surfaced this issue in its new-trial motion. That is still an unpreserved challenge, however, so our review is limited to a search for plain error. United States v. Brandao, 539 F.3d 44, 57 (1st Cir. 2008); accord Springer v. Henry, 435 F.3d 268, 283 (3d Cir. 2006).

Plain error is one hard test to meet, particularly in civil litigation. See Smith v. Kmart Corp., 177 F.3d 19, 26 (1st Cir. 1999). Plain error is (1) error which (2) is so clear that a trial judge should act even without an objection and which (3) affects the appellant's substantial rights – on top of that, even if the appellant makes this required showing, we need not intervene unless the error also (4) seriously impugns the "fairness, integrity, or public reputation of judicial proceedings." United States v. Roy, 506 F.3d 28, 30 (1st Cir. 2007) (quotation marks omitted); see also Smith, 177 F.3d at 25; Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. West Lake Acad., 548 F.3d 8, 22 (1st Cir. 2008). Consequently, Misty Dawn faces a steep climb nearing 90 degrees – ultimately, that slope is insurmountable.

Misty Dawn cites no First Circuit cases banning lawyers from suggesting a damage number to the jury. Instead it says that federal courts tend to let counsel make unit-of-time arguments during summation (e.g., a lawyer tells the jury plaintiff's pain is worth *X* dollars per day, month, or year and then multiplies it by plaintiff's life expectancy to get a lump-sum figure). Bielunas's

-11-

lawyer did just that, proposing a number and discussing a process through which the jury could reach it.[4]

Some courts permit unit-of-time arguments, some leave the matter to the trial judge's discretion, and some ban the practice outright – though most courts, particularly federal courts, seem to fall into the first two camps. See generally Mileski v. Long Island R.R. Co., 499 F.2d 1169, 1173 n.2, n.3, n.4 (2d Cir. 1974) (collecting federal and state cases); Giant Food Inc. v. Satterfield, 603 A.2d 877, 879-80 (Md. Ct. Spec. App. 1992) (same). Not this Court, however. We forbid counsel from asking jurors to consider the amount of a party's ad damnum in crafting a damage award, see Davis v. Browning-Ferris Indus., Inc., 898 F.2d 836, 837-38 (1st Cir. 1990); see also Wilson v. Bradlees of New England, Inc., 250 F.3d 10, 23 n.25 (1st Cir. 2001) – and we have cited

---

[4] Here is a sampling of what Bielunas's counsel said (again, without drawing any objection):

Past and future physical pain and suffering: Noting that there are 365 days in a year, counsel suggested $282,000 for "past physical pain and suffering" – $200,000 for the first year (given the immediate "horror" of the calamity), $50,000 for the second year, and $32,000 for the third. Bielunas is "55 years old," counsel added, and is expected to live another 25 years, so "you should award him $800,000 for future physical pain and suffering because he's going to live with that [pain] every day."

Past and future mental anguish: "I think the mental anguish of this thing is conservatively $20,000 a year," counsel said. "That's $20,000 a year for the last three years" and "for the rest of his life," counsel added, which comes to $560,000.

Past and future disability and inconvenience: Bielunas's "past disability is permanent," counsel argued. "And I submit to you that $33,000 a year" is a good number to cover "the impairment and the inconvenience," which comes to $924,000.

approvingly a case outside this circuit for the point that lawyers cannot state in summation the number they think jurors should award for pain and suffering. See Davis, 898 F.2d at 837 (highlighting Waldorf v. Shuta, 896 F.2d 723 (3d Cir. 1990)). Building on this foundation, we held in an unpublished opinion that Davis precludes counsel from requesting a pain-and-suffering dollar amount in closing. Kimberly F. v. Mary Hitchcock Mem. Hosp. & Hitchcock Clinics, Inc., No. 93-1438, 1993 WL 498026, at *9-10 (1st Cir. Dec. 3, 1993) (unpublished). Consistent with the Davis line of cases, district judges in this circuit have stopped lawyers from doing just that. See Wilson, 250 F.3d at 23 n.25; see also generally Budet-Correa v. United Parcel Serv., 322 F.Supp.2d 139, 141-42 (D.P.R. 2004) (discussing and applying Davis and the like). Consequently, measured by our precedents we conclude that the district judge here made a mistake, and that the mistake is obvious enough. But, again, plain error requires more: the mistake must also be prejudicial in a sense that there is a reasonable probability (not just a theoretical possibility) that it affected the result, and the result must be unjust, too. See United States v. Marcus, 130 S. Ct. 2159, 2164 (2010); see also United States v. Padilla, 415 F.3d 211, 225 (1st Cir. 2005) (Boudin, C.J., concurring) (en banc). This is where Misty Dawn gets tripped up.

For starters, we are not convinced that this was a game-changing error. Cf. United States v. Taylor, 54 F.3d 967, 972 (1st

-13-

Cir. 1995) (stressing that the plain-error doctrine focuses on "blockbuster[]" errors) (quotation marks omitted).  We question whether Misty Dawn can show that it is reasonably probable – as opposed to merely possible – that the jury would have fixed a different damage figure absent the unit-of-time breakdown.  That the jury found Bielunas 15% comparatively negligent as opposed to the 5% his lawyer had argued for suggests that the jury did not blindly adopt counsel's analysis.  But we need not dwell on this issue.  See Johnson v. United States, 520 U.S. 461, 469 (1997) (skipping over the third component of the plain-error test and deciding the case on the fourth prong).  Assuming for argument's sake that the breakdown affected the outcome of the case, we see no injustice here:  given that Bielunas will live out his life in pain, deprived of his livelihood (details we delve more deeply into below), we cannot say that the award is intolerable.

If more were needed – and we doubt that it is – the judge in his charge made clear that the lawyers' statements and arguments were not evidence and that the verdict must be reached on the evidence alone.  Misty Dawn's counsel did not object or request any instruction on the unit-of-time issue.  After deliberating for a bit, the jury asked the judge if Bielunas's lawyer could go over the "suggested award amounts" and the "reasoning" used to reach them.  Misty Dawn's attorney asked the judge to remind the jurors that arguments were not evidence in the case and that they are "to

decide" the matter "on their own."  The judge agreed and told the jury:

> I presume that you are referring to the plaintiff's counsel's argument to you where it was all laid out.  I am not going to have him do that again nor should he have to do it again.
> What I want you to do is to use your collective memories as to what he said and what reasoning . . . he offered for the conclusions that he suggested to you. And have in mind . . . what I told you before, that statements of counsel . . . are not the evidence in the case.  You are supposed to remember what the evidence was.
> What counsel was endeavoring to do was to remind you of what the evidence was and put his interpretation before you so you could consider it.  So that is the answer to that.  You are to try to remember the evidence yourself.

Misty Dawn's lawyer did not object or ask the judge to say anything else, and we think the judge's instructions help undercut any plain-error claim.  See United States v. Robinson, 473 F.3d 387, 398 (1st Cir. 2007).

Plain error is not an "appellant-friendly" standard, United States v. Vazquez-Molina, 389 F.3d 54, 57 (1st Cir. 2004), vacated on other grounds 544 U.S. 946 (2005), and rightfully so:  it keeps parties from rolling the dice on a favorable verdict and then raising problems on appeal that could have been easily fixed with a timely objection below.  See, e.g., United States v. Jacquillon, 469 F.2d 380, 386 (5th Cir. 1972) (Wisdom, J.).  Ultimately, that standard – which is exceedingly tough to meet – cannot be met here.

### The damage amount

As a parting shot, Misty Dawn calls the jury's non-economic

damage award (over $2,000,000) unreasonably high and faults the district judge for not ordering a remittitur. We see things differently.

Converting legal damages into a monetary award is the jury's job – consequently, only rarely and in extraordinary circumstances will we veto the jury's decision. Casillas-Díaz v. Palau, 463 F.3d 77, 82-83 (1st Cir. 2006). That is particularly true when the district judge, who saw and heard the evidence play out, refuses to trim the award. Id. at 83. Stepping lightly, we review that ruling for abuse of discretion, reversing only if the defendant carries the weighty burden of proving that the contested award is "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." Id. (quotation marks omitted). This means that we will not jettison a damage award simply because we think it too generous, see Whitfield, 431 F.3d at 15-16, but will reverse "only if it is shown to exceed any rational appraisal or estimate of the damages that could be based upon the evidence before the jury." Casillas-Díaz, 463 F.3d at 83 (quotation marks omitted).

There is no mathematical formula for determining the monetary equivalent of non-economic injuries. See, e.g., Limone v. United States, 579 F.3d 79, 105 (1st Cir. 2009). But the district judge told the jurors, without objection, that they could consider any physical, mental, or emotional pain Bielunas has suffered, is

-16-

suffering, and will suffer because of his wounds. Damages must be reasonable and not based on hunches, the judge stressed, but "no evidence of value" is needed for the intangible injuries: in translating a decision into dollars, "you are not determining value but you should award an amount that you feel will fully and fairly compensate" Bielunas for his past, present, and future mental distress and physical pain. The issue, then, is inescapably "fact-bound," see Casillas-Díaz, 463 F.3d at 83, and the facts, measured under the legal criteria outlined above, support the district judge's decision not to pare down the award.

Bielunas suffered unimaginable pain on the SEA WATCHER, and pain clings to him still. A multi-ton hatch cover crushed his foot, pulverizing a bone, fracturing others in multiple places, and leaving the whole thing a bloodied mess. The doctors could not close the wound for the longest time, and they will never make him fully better – actually, things will only get worse. And the injury has exacted quite a toll, causing him to lose many of the things that made his life worth living. No more working on a fishing boat – in fact, no more meaningful employment at all. No more taking long hikes with friends and family. No more doing certain chores around the house. No more helping neighbors with home-improvement projects. All of this has left him feeling powerless, lost, and depressed. He worries about his future, he lashes out at others, and his marriage has suffered, too. Taking

-17-

everything into account, we cannot say that the jury's award is unconnected to the evidence, conscience-shocking, or so lavish that it would offend common notions of justice if it stands – so no remittitur is needed.

Misty Dawn makes much of the fact that Bielunas does not take pain medication and had fractured the heel on the same foot years before, an injury that Misty Dawn's expert suggested caused many of the same problems that Bielunas complains about now. None of this changes our view of the case, however. Again, Bielunas explained in exquisite detail how much pain he had after the hatch cover tore a hole in his foot and how much pain he has now – constant, he said, even though he avoids pain pills, and the medical evidence backs up his chronic-pain claim. As to the heel issue, Bielunas never missed a day of work because of that injury, a fact that pours cold water on the expert testimony that Misty Dawn points to – testimony that the jury could, and evidently did, disbelieve in any event. Cf. Primus v. Galgano, 329 F.3d 236, 245 (1st Cir. 2003).

Citing to Anthony v. G.M.D. Airline Serv., Inc., 17 F.3d 490 (1st Cir. 1994), and Laaperi v. Sears, Roebuck & Co., 787 F.2d 726 (1st Cir. 1986), Misty Dawn also argues that because we rejected jury awards there, we should do so here. But these cases offer no aid. For one thing, they are 16 and 24 years old, respectively, which in this context makes them "not particularly helpful" for

comparison purposes, see Whitfield, 431 F.3d at 16 (saying so with respect to a 16-year-old precedent). For another thing, they are easily distinguishable from this case. Anthony found a $566,765 pain-and-suffering award unconscionable because the plaintiff's injury – which was neither painful (relatively speaking) nor permanent – did not "render[] him unable to perform any particular functions or engage in any particular activities [or] otherwise interfere[] with his professional, recreational, or personal life." Anthony, 17 F.3d at 491, 494-95. Laaperi considered a $750,000 damage award conscience-shocking because the plaintiff suffered "relatively minor injuries, involving no continuing disability" (other than "a non-disabling permanent scar on her lower back, there was no evidence of any medical problems whatsoever within a month and a half" after the incident). Laaperi, 787 F.2d at 734-36. Anthony and Laaperi look nothing like this case, given the huge toll Bielunas's injury has taken on his body and mind.

Misty Dawn also highlights a boatload of non-First Circuit cases where lower courts deemed certain damage awards excessive. Measured against these cases, Misty Dawn says, the objected-to portion of Bielunas's damage award is legally unsustainable. Not so: simply "showing that the damage award is generous in comparison to other (hand-picked) cases is insufficient to warrant relief." Correa v. Hospital San Francisco, 69 F.3d 1184, 1198 (1st Cir. 1995) (citing Havinga v. Crowley Towing & Transp. Co., 24 F.3d

-19-

1480, 1488-89 (1st Cir. 1994) (not necessary to compare cases involving dissimilar traumas, dates and locations of trials, and evidence presented)); accord Whitfield, 431 F.3d at 16 (stressing that we will not reject a damage award "merely because the amount of the award is somewhat out of line with other cases of a similar nature") (quotation marks omitted).    Ultimately, we see no compelling reason to override the jury's judgment here.[5]

### Conclusion

For the reasons arrayed above, we **reject** Misty Dawn's appeal and **affirm** the judgment below in all respects.    Each side shall bear its own costs.

**So Ordered**.

---

[5] The parties also spar over whether Bielunas's counsel told Misty Dawn's lawyer in a phone call that the award's size "shocked" both him and his client.  That makes not one whit of difference: what counts is whether the award shocks our conscience (it does not), not whether it shocks counsel's or his client's.